No. 3--05--0032          Filed:  10-5-07

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.  03--CF--821 |
| STEVEN D. LISLE, JR., | ) ) | Honorable Charles H. Stengel, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the opinion of the court:

Defendant, Steven Lisle, Jr., was convicted of first degree murder and aggravated battery following a jury trial in the circuit court of Rock Island County.  He appeals, claiming improper hearsay testimony was admitted, necessitating reversal of his convictions and entitling him to a new trial.  Defendant also claims the State failed to offer evidence sufficient to convict him of the first degree murder of LaRoy Owens.  We affirm.

BACKGROUND

Defendant's jury trial commenced on September 27, 2004.  The State's first witness was DeMarco Hearn, the first cousin of the

victim, LaRoy Owens.  DeMarco lived at 513 6th Avenue in Rock Island and was at home asleep in his room on the morning Owens was shot.  He was awakened by a loud noise and his mom saying she heard shooting on the side of the house.  Within a couple of minutes of the sound of the shots, DeMarco went outside and saw Owens lying on the ground next to a van.  DeMarco called 911 after he checked for a pulse on Owens and could not feel one.

Tarisita Nimmers testified that the location of her house at 518 6th Avenue in Rock Island is about a half of block from the location where Owens was shot.  Nimmers heard a single shot followed by a 10-second pause and then five or six shots in rapid succession.

Judy Dixon, likewise, testified that she lived close to the scene of the shooting and was at home when the police arrived early in the morning on September 15, 2003.  She had just returned home from work and was changing her clothes when she heard gunshots.  She recalled a pause of a few seconds after hearing the first shot, then a series of five more shots rang out.  Following the sounds of the shots, Dixon heard what sounded like two separate voices, as if the people talking were moving down the alley that runs next to Dixon's house.

Chantel Gillette, a police officer with the Rock Island police department, testified that she was the first to respond to the scene at 513 6th Avenue.  She arrived at the scene at

2

approximately 4:15 a.m. on September 15, 2003. When she arrived, she observed DeMarco pointing in the direction of a body that was lying next to the driver's door of a vehicle parked in the driveway. She went up to the body, saw a gunshot wound to the victim's head, and determined that the person had no pulse. The officer then took steps to keep the area from being disturbed until other officers arrived. After she secured the area, Gillette followed a trail of blood she saw leading down the driveway and onto 6th Avenue. The trail led to the home of Angela Lee in the 700 block of 9th Avenue. Gillette testified that there were no significant pools of blood at any point along the trail. When she arrived at the Lee residence, the person who had been bleeding was already on his way to the hospital.

Mary Devine testified that she was employed as a "technical investigator" for the Rock Island police department. She personally took photographs and measurements of certain bloodstains that were located on and in a Ford Windstar minivan parked at the crime scene. She visually examined the van for blood while the van was at the crime scene and then later, in the more controlled and well-lit location at the Rock Island police department. During these examinations, Devine recovered samples of blood she found at various locations on the inside and outside of the van. She submitted the samples to the Morton crime lab for testing. A stipulation was entered into evidence noting that

3

a forensic scientist at the Morton crime lab, Debra Minton, ascertained that the DNA from the blood found by Devine on the inside panel of the driver's-side door matched the DNA profile of the decedent Owens. A separate stipulation indicated that Minton would testify that the DNA from the blood that was found on the front passenger door of the minivan near the door handle matched the DNA profile of Ronald Hearn (thereinafter Hearn). Devine testified that, in her opinion, the bloodspatter evidence she observed and collected was consistent with Hearn having been shot somewhere on the passenger side of the minivan.

Devine also described, by reference to a diagram, the location of six spent shell casings that she recovered at the scene. Devine indicated that one of the shells was found on the driver's side of the van and all of the others were recovered from areas outside the van. Devine was not able to find any fingerprint evidence on the shell casings. Devine also obtained one fired bullet from within the fabric of the front passenger seat of the van and took possession of the bullet that was removed from the body of Owens. Another stipulation was then admitted into evidence that indicated firearms expert Chris Kozel received the six shell casings and two bullets from Devine. He examined and performed tests on the casings and projectiles and was able to render an opinion that all of the casings and projectiles were fired from the same 9-millimeter handgun.

4

Devine further testified that the bloodspatter patterns of the drops of blood she observed and collected from the ground and on one of the shell casings near the passenger-side of the van were consistent with the injuries Hearn sustained. Whereas the bloodspatter pattern found on the passenger-side door was more likely to have been caused by the initial trauma of the bullet impact, the blood she observed in the area of the shell casings and going across the driveway was of a low impact variety. Another stipulation was read during the latter part of Devine's direct examination that indicated Minton had identified the DNA in the blood recovered from the ground near shell casing number two and it matched the DNA of Hearn.

Dr. Edward Leon testified that he is an emergency room physician and was working at Trinity West Hospital when Hearn was brought in sometime between 4:30 and 5 a.m. on September 15, 2003. When Dr. Leon initially examined Hearn, Hearn was in stable condition with 10 entry and exit bullet wounds. It appeared to Dr. Leon that the 10 wounds represented 5 "through and through" injuries in which the bullets had both entered and exited Hearn's body. Dr. Leon testified that the location of the five shots that entered Hearn's body were to the right side of his cheek, his left shoulder, and in the area of his left thigh and left buttocks.

The State called defendant's father, Stephen Lisle, Sr.,

5

during its case-in-chief. Lisle, Sr., testified that early on the morning of September 15, 2003, he received a call on his home phone from his son, the defendant. Defendant was looking for the phone number of one of his two sisters. Lisle, Sr., did not give the number to defendant as it was 4:30 in the morning and he had to go to work that morning.

Steven Metscaviz, a detective with the Rock Island police department, testified that he responded to the scene at 513 6th Avenue in Rock Island at 5 a.m. on September 15, 2003. Detective Metscaviz found the body of Owens next to the open driver's door of a blue 1995 Ford Windstar van parked in the driveway. According to Detective Metscaviz, defendant was taken into custody at his girlfriend's house in Davenport, Iowa, nine days later. Defendant gave a statement to Detective Metscaviz and the lead detective in this case, Dave Sullivan, after he talked to his pastor and his attorney at the police station in Rock Island. At around 6 p.m. on September 24, defendant, his counsel, and the two detectives (Metscaviz and Sullivan) were present while defendant heard and waived his rights under *Miranda*. Defendant told the detectives that he had not been with Hearn or Owens on the evening of September 14 or during the early morning hours of September 15. Defendant also said he had not been with a person named Korey Randle during these times. He said he found out that Owens and Hearn had been shot during a telephone call he received

6

from an unnamed female. He told the detectives that, at the time the shooting took place, he was at his mom's house at 629 7th Street. As defendant was sitting on the front steps at that time, a person who knows him named Darryl Hicks walked by and saw him sitting there. Earlier in the afternoon on September 14, defendant told the investigators that he had been at Maudy Traywood's house on 6th Street where a party was being held for Steven Leonard. While at this party, defendant saw Hearn and Owens. The detectives asked whether defendant had also seen someone called "C Rider" at this party. Defendant did not know who "C Rider" was, but when the detectives told him that was a name Korey Randle is known by, defendant said he knew who Randle was. Defendant did not recall whether he saw Randle at the party at Traywood's house.

On cross-examination, Detective Metscaviz acknowledged that defendant had described Owens as a close friend who spent time at defendant's house every day. The detective also acknowledged that the police had failed to locate any weapon that could be tied to the shooting incident on September 15, 2003.

Darryl Hicks testified that he knew defendant and Owens. On the night Owens was shot, Hicks was walking home and saw defendant going into his mother's house on 7th Avenue. No one was with defendant at the time, and Hicks estimated this occurred around five minutes prior to the shooting. Hicks testified that

7

he did not hear any shots from his house and he could not testify with certainty where the defendant was when the shots were fired.

Rock Island police detective David Sullivan testified that he participated in a second interview of defendant that was conducted on June 4, 2004, after defendant and his attorney had already provided the Rock Island police with a verbatim transcript of an audiotape statement defendant previously made to his attorney on May 24, 2004. According to Detective Sullivan, the interview on June 4 was conducted in an effort to clarify some details that were discussed in defendant's May 24 statement. However, the interview on June 4 was not transcribed, audiotaped, or videotaped. During the June 4 interview, defendant indicated that he was, in fact, present with three other people in the driveway of 513 6th Avenue at the time Owens was killed. In addition to Owens, the people who were in or near the minivan were the defendant, Ronald Hearn, and Randle. Detective Sullivan proceeded to detail the contents of defendant's May and June statements, beginning with what defendant stated in his recorded statement of May 24, 2004.

I. Information Defendant Provided in May Statement
As Testified To By Detective Sullivan

Defendant disclosed that he was picked up by Randle and Randle's little brother, Paris, at around 2 or 3 p.m. on September 14, 2003. Randle dropped defendant off at defendant's

8

mom's house on 7th Street and he stayed there for awhile before walking down to Hearn's house at 513 6th Avenue. From there, defendant walked a half a block to Traywood's house, where a party was being held. A short time after he arrived, defendant saw Owens and Hearn come to Traywood's house. Paris Randle asked to buy drugs from Owens, but Owens was not able to sell him any on the spot. Owens kept a supply of drugs at the house of a girlfriend who had recently evicted Owens from her premises. Defendant refused Owens' request to go to the girlfriend's house and retrieve Owens' stash of cocaine, after which Owens and Hearn left the party and managed to get inside the girlfriend's house to retrieve the drugs. Defendant indicated that Owens went to Hearn's house and stashed his drugs somewhere on that property. Defendant went from the party on 6th Street to Buck's Tavern, where the police eventually came and chased away a group that was standing outside the tavern. Defendant again met up with Korey Randle as he walked away from Buck's Tavern, and together they drove in the Windstar to defendant's mother's house. While the two were hanging around there, at midnight or 1 a.m. on September 15, Owens and Hearn drove up in a gray Monte Carlo. Defendant and Randle then drove the minivan to a Quick Shop store, where they intended to buy more alcohol. Hearn and Owens also went to Quick Shop and the four men purchased cigars and alcohol. Both vehicles were driven from Quick Shop to Angela Lee's residence on

9

9th Avenue.  Ultimately, the four men later left in the minivan and drove to 513 6th Avenue, where Hearn lived.  According to defendant, Owens and Hearn left the Monte Carlo at Lee's residence and got in the van with the defendant and Korey Randle.

Describing what took place immediately prior to the shooting, defendant said Owens received a call from someone who was ready to buy some drugs.  Owens exited the van to find the stashed cocaine and returned when he could not find the drugs in the spot he had hidden it.  When Owens exited the van to try to find the cocaine, defendant went to the side of Hearn's house to urinate.  Defendant said that he was still urinating when Owens returned to the van, cussing at Hearn about the missing drugs.  Owens reached under the mat of the minivan and pulled out a gun, which he then used to shoot at Hearn.  Defendant stated Hearn was still inside the van when Owens began shooting.  Defendant had just returned to the van and jumped in the middle seat when Owens pointed the gun toward Hearn and fired a few shots.  As soon as Owens began shooting, Korey Randle, who was seated in the fully reclined front passenger seat, exited the van and ran away.  Hearn got out of the van and began to wrestle with Owens, at which time Owens shot Hearn two more times.  According to the defendant, Hearn managed to gain control of the gun from Owens and, as Owens tried to get in the driver's seat of the van, Hearn shot him.  Defendant said Hearn began shooting at the defendant

10

after Hearn shot Owens.  This caused defendant to flee.  He caught up with Korey Randle and the two left the area together.

## II. Information Defendant Provided In June Statement As Testified To By Detective Sullivan

Defendant provided further details about the shooting during his interview with the police on June 4, 2004.  He indicated that while he was with the others in the van as it was parked in Hearn's driveway, Owens and Randle were sitting in the front seats, defendant was in the middle seat and Hearn sat in the far rear seat.  In the June interview, defendant mentioned the name of the person who had called Owens' cell phone about buying drugs.  Defendant described Owens as angry with Hearn after he looked for but could not find the cocaine allegedly hidden on the property at Hearn's residence.  Defendant said that even after he left the van to urinate, he was in a position where he could see and hear what was happening inside the van.  Owens was accusing Hearn of stealing the drugs because Hearn was the only person, other than Owens, who knew where the drugs had been hidden.

Detective Sullivan continued his testimony by noting that defendant was asked specifically if anyone other than the four people in the minivan were in the area at the time of the shooting, to which defendant indicated the only other person nearby was a person he called "Molina."  Molina was at the park waiting for Owens to deliver drugs to him.  Defendant said that

11

he thought two or possibly three shots were fired while Owens and Hearn were inside the van and another two shots were fired outside the van.  Once Owens and Hearn were outside the van wrestling, Hearn obtained control over the gun and pursued Owens around the van from the passenger side to the driver's door. Hearn came up from behind Owens just before shooting Owens in the head at close range.  Defendant told the police that Hearn dropped the gun he used to shoot Owens, pulled a different gun, and started to shoot at defendant and Korey Randle.  When Detective Sullivan asked defendant how Randle could have been shot at by Hearn when he had fled as soon as the first shot was fired, defendant stated that he was the only one Hearn was shooting at after Owens had been shot.  Sullivan asked defendant if he knew who Ricky Childs was and whether Childs was present at the time of the shooting.  Defendant said he knew Childs, but that Childs was not present.

On cross-examination, Detective Sullivan conceded that defendant had, at no time during any of his statements, admitted to shooting anyone.  The detective testified that, despite the efforts by his department, the police were unable to find Korey Randle.  Detective Sullivan also admitted that the police have never discovered a weapon that could be tied to this case.

III. Further Evidence Admitted At Trial

Dr. Larry Blum testified that he is a licensed physician

12

whose specialization is in forensic pathology. He was declared an expert in his field and testified that he performed the autopsy on Owens. Dr. Blum stated that Owens died as a result of a single gunshot that entered his brain after passing through his right ear. In the doctor's opinion, the shot was fired from within inches of Owens' ear and death would have resulted rapidly, if not immediately, after the bullet struck.

Christopher Kozel, a forensic scientist employed by the Illinois State Police, testified as an expert in firearm and tool marker identification. Kozel received a number of clothing items that were worn by Hearn at the time he was shot. He identified certain holes in the jacket Hearn wore as having been caused by bullets that struck the jacket in the back right shoulder, and two places where the initial entry point was through the interior fabric of the jacket. Each of these three entry points manifested gunpowder residue, indicating a close-range firing of the gun.

Kozel gave his opinion regarding the type of gun that he determined was consistent with the rifling characteristics of the two bullets that were recovered in this case. According to Kozel, the pattern and directions of the grooves on the bullets matched those that are made by a semiautomatic pistol manufactured by "High Point." Kozel testified that, in his experience, the shells that are ejected from the "High Point"

13

brand 9-millimeter pistol always eject to the right side. Kozel confirmed that he had also made a determination that the six shells found at the crime scene matched each other and were all fired from the same gun.

On cross-examination, Kozel testified that he did not perform tests on the sleeves or cuff areas of Hearn's jacket for gun powder residue, but that a colleague of his had. While Kozel matched all of the shell casings and bullets submitted to him to a single 9-millimeter pistol, he could not testify that all of the bullet wounds Hearn suffered were caused by a 9-millimeter gun.

Robert Berk, also a forensic scientist employed by the Illinois State Police, testified that his expertise is in the area of analyzing trace evidence. His testing on the cuff portion of the left sleeve of Ronald Hearn's jacket led Berk to conclude that gunshot residue was present on that part of the jacket. This meant that Hearn's cuff was "in the environment of a weapon" when the weapon was fired, and could have been the result of Hearn discharging a weapon or having his left hand close to a gun when someone else fired it. Berk was able to conclude that no gunshot residue was present on either of the sleeves of the jacket worn by Owens.

When the jury trial resumed on September 29, 2004, Detective Metscaviz was recalled to the stand. His testimony was limited

14

to an interaction that he observed between defendant and Korey Randle. This interaction took place while Randle was being interviewed by Detective Metscaviz in a room at the county jail. During the interview with Randle, the defendant, who had been arrested about a month earlier, was walking by the interview room and made a statement that Detective Metscaviz was able to hear. Looking at Randle, defendant said, "Yo, man. Those guys are trying to frame me." Metscaviz interpreted that defendant was directing that comment at the officer or to his department in general. Then, looking in the direction of the detective, defendant said, "What are you doing talking to those guys?" Before moving out of the view of Randle and Detective Metscaviz, defendant raised his hands and moved a forefinger across his throat. Defendant's movement was observable to Randle.

Angela Lee was called to testify and noted that she had been asleep at her home on 9th Avenue in Rock Island early in the morning on September 15, 2003, when her nephew, Ronald Hearn, woke her up by yelling her name from just outside the back door to her house. She turned over on the couch to look toward the back door and saw Hearn leaning against the doorway. Hearn stated he had been shot. After she helped her nephew get outside to wait for the emergency personnel to arrive, she began asking Hearn who shot him. At first Hearn told Lee, "Roy shot," but when Lee asked him if he meant Roy was the shooter, Hearn said

15

no, and repeated the words, "Roy shot." When Lee asked Hearn to tell her "who did this to [him]," Hearn pulled her close to him and said the words, "Steve, and Korey was with him." Lee testified that her nephew made the statements before any officers arrived at her house.

Defendant called Steve Lisle, Sr., as his first witness. Lisle, Sr., testified that defendant and Owens had been good friends for at least six years, that they were together all the time, and that they spent many nights at the same house. Lisle, Sr., could not think of any reason his son would have had to shoot Owens. Lisle, Sr., also denied that he had told anyone that defendant had asked for the phone number of the sister that lives in Indianapolis, Indiana, when defendant called Lisle, Sr., at 4:30 a.m. on the morning Owens was shot.

Defendant's mother, Jessie Lisle, testified that she was at her home on a corner lot at 7th Street and 7th Avenue, throughout the night on September 14. Defendant came to and left the house a number of times throughout the night. Jessie testified that she was still awake at around 3:40 a.m. and sitting on her front porch when she heard what sounded like firecrackers. Before she could place a call to try to reach her son, she saw defendant calmly walking by himself toward the house. She told defendant not to be returning with Owens to the house later that night, since it would wake her up. Defendant assured her that he would

16

not be coming back to the house that night and she had no further contact with him the rest of the night.

After defendant rested with no further witnesses being called, the State called Detective Metscaviz as a rebuttal witness. The detective testified that, while he was questioning Steve Lisle, Sr., and Jessie Lisle at Jessie's house on 7th Street on the day the shooting, Lisle, Sr., stated that at approximately 4:30 that morning defendant had placed two calls to him. Lisle, Sr., indicated that defendant was asking for the phone number of Lisle, Sr.'s daughter, Steva, who lived in Indianapolis. The detective testified that Lisle, Sr., also said defendant had told him that he needed Steva's phone number because he was going to have to leave town. After this testimony, both sides rested and the trial court denied defendant's renewed motion for a directed verdict.

After deliberating for parts of two days, the jury found defendant guilty of first degree murder and the charge of aggravated battery. Following a sentencing hearing on December 10, 2004, the trial court sentenced defendant to terms of 27 and 10 years' imprisonment, specifically finding that the sentences were required to run consecutively to one another. This appeal followed.

## ANALYSIS

Defendant raises three issues on appeal. First, defendant

17

contends that the trial court erred in allowing Angela Lee to testify that Ronald Hearn told her that defendant was the one who shot him.  Defendant claims that it was reversible error to find Hearn's statement admissible under the excited utterance exception to the hearsay rule.  Second, defendant further argues that allowing Lee to testify as to what Hearn said violated his federal and state constitutional rights to confront witnesses against him, as well as the principles set forth in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004).  Finally, defendant argues that evidence adduced at trial was insufficient to find him guilty beyond a reasonable doubt for the murder of LaRoy Owens.

## I. Excited Utterance

Angela Lee testified that Ronald Hearn identified defendant as the person who shot him.  Defendant claims Lee's testimony should not have been admitted under the excited utterance exception to the hearsay rule and, therefore, Lee's testimony should have been excluded as inadmissible hearsay.

For a hearsay statement to be admissible under the spontaneous declaration or excited utterance exception: (1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) there must be an absence of time for the declarant to fabricate the statement; and (3) the statement must relate to the circumstances of the

18

occurrence.  *People v. Edwards*, 144 Ill. 2d 108, 579 N.E.2d 336 (1991).  In determining whether a hearsay statement is admissible under the spontaneous declaration exception, courts employ a totality of the circumstances analysis.  *People v. Williams*, 193 Ill. 2d 306, 739 N.E.2d 455 (2000).  This analysis involves the consideration of several factors, including time, the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest.  *People v. House*, 141 Ill. 2d 323, 566 N.E.2d 259 (1990).

The fact that a declarant's statement is made at the first opportunity to speak supports a finding of spontaneity (*People v. Gacho*, 122 Ill. 2d 221, 522 N.E.2d 1146 (1988)), but a declarant may make a spontaneous declaration to a person even after having spoken previously to another.  *House*, 141 Ill. 2d at 386.  "Although a statement made in response to persistent interrogation might not be admitted under the spontaneous declaration exception [citation], the fact that a statement was made in response to a question does not necessarily destroy spontaneity."  *Williams*, 193 Ill.2d at 353, citing *People v. Smith*, 152 Ill. 2d 229, 604 N.E.2d 858 (1992).  No one factor is dispositive.  *Williams*, 193 Ill. 2d at 353.

The time factor has been described as an elusive factor whose significance will vary with the facts of each case.  *House*, 141 Ill. 2d at 382.  "[T]he period of time that may pass without

19

effecting the admissibility of a statement under the spontaneous declaration exception varies greatly." *Williams*, 193 Ill. 2d at 353. In *People v. Gacho*, a statement made 6½ hours after the occurrence was held admissible (*Gacho*, 122 Ill. 2d at 240-42), while in *People v. Newell*, a statement made 20 minutes after the occurrence was properly excluded. *People v. Newell*, 135 Ill. App. 3d 417, 481 N.E.2d 1238 (1985).

> "The critical inquiry is 'whether the statement was made while the excitement of the event predominated.'" *Williams*, 193 Ill. 2d at 353.

We review evidentiary rulings of a trial court deferentially and will reverse only if the trial court abused its discretion. *People v. Sullivan*, 366 Ill. App. 3d 770, 853 N.E.2d 754 (2006). A trial court abuses its discretion when its ruling is so arbitrary, fanciful, or unreasonable that no reasonable person would take the view it adopted. *People v. Illgen*, 145 Ill. 2d 353, 583 N.E.2d 515 (1991).

Defendant admits, "There is no question" that the shooting was a sufficiently shocking event to cause Hearn to make an "excited and unreflecting statement." Defendant further concedes that Hearn's statement, as testified to by Lee, bore a direct relation to the circumstance of the shooting. Defendant argues, however, that the statement was admitted in error. Defendant claims that the trial court failed to properly weigh the

20

intervening time between the shooting and the statements. Defendant continues that since the statement was the product of Lee's "questioning," it was not truly an excited utterance and should have been deemed inadmissible hearsay. We disagree.

At most, 18 minutes passed between the shooting and Hearn's statement to Lee. Hearn was shot five times, each bullet entering his body and exiting it. While his statements followed his aunt's inquires into who shot him, we find that fact insufficient to defeat the spontaneous nature of the statement. Undoubtedly, the statement was made while the excitement of the event predominated. The statement bore a direct relation to an unbelievably shocking occurrence. Therefore, we cannot say that the trial court abused its discretion in holding Lee's testimony was permissible under the excited utterance exception to the hearsay rule.

## II. Right to Confront Witnesses, Testimonial Evidence and *Crawford v. Washington*

Defendant's second argument on appeal is that the trial court violated his right to confront witnesses against him by allowing Lee to testify about Hearn's statement. Defendant notes that both the state (Ill. Const. 1970, art. I, §8) and federal (U.S. Const., amend. VI) constitutions provide a criminal defendant the right to confront the witnesses against him. Citing *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177,

21

124 S. Ct. 1354 (2004), as authority, defendant claims it was improper to allow Lee's testimony claiming Hearn's statement was testimonial and not subject to cross-examination.

The State responds by arguing that Hearn's statement was not testimonial and, as such, *Crawford v. Washington* is inapplicable. In the alternative, the State contends that even if we find the statement to be testimonial in nature, *Crawford* does not preclude its admission since the statement falls within recognized common law exceptions to the hearsay rule. Finally, the State concludes its response on this issue by claiming admission of the statement was, at most, harmless error.

Since the Supreme Court issued its decision in *Crawford*, courts have struggled with determining exactly which statements are testimonial in nature and which are nontestimonial. *In re T.T.*, 351 Ill. App. 3d 976, 815 N.E.2d 789 (2004); *People v. R.F.*, 355 Ill. App. 3d 992, 825 N.E.2d 287 (2005); *People v. West*, 355 Ill. App. 3d 28, 823 N.E.2d 82 (2005); *People v. Purcell*, 364 Ill. App. 3d 283, 846 N.E.2d 203 (2006). A review of recent case law in our appellate districts indicates that there exist two developing theories regarding how to determine if a statement is testimonial in nature.

In *People v. R.F.*, one panel of the First District held that "*Crawford* does not apply to statements made to nongovernmental personnel, such as family members or physicians. When an out-of-

22

court statement is made to nongovernmental personnel and, thus, is nontestimonial, the 'indicia of reliability' framework of *Ohio v. Roberts*, and the hearsay exception *** continue to apply." *People v. R.F.*, 355 Ill. App. 3d at 1000. This line of reasoning was endorsed by the dissent in *In re E.H.*, 355 Ill. App. 3d 564, 823 N.E.2d 1029 (2005), *rev'd on other grounds by In re E.H.*, No. 100202 (December 21, 2006). In his dissent, Justice Quinn noted that, "The great weight of authority supports the proposition that where the proffered statements were not made to a governmental actor such as law enforcement (or their proxy), under *Crawford* the statements cannot be testimonial regardless of their content." *In re E.H.*, 355 Ill. App. 3d at 580 (Quinn, J., dissenting).

A competing school of thought developing in our courts is that statements made to nongovernmental personnel can be testimonial in nature. The court in *In re T.T.* acknowledged that, "*Crawford* indicates that governmental involvement in some fashion in the creation of a formal statement is necessary to render the statement testimonial in nature." *In re T.T.*, 351 Ill. App. 3d at 988. Nevertheless, the court went on to find that the victim's "accusatory statements identifying respondent as the perpetrator" made to a private physician were testimonial in nature. *In re T.T.*, 351 Ill. App. 3d at 993. Focusing on the content of the statement rather than to whom it was made, the

23

*Purcell* court followed the lead set by *In re T.T.* stating that "when the content of the victim's statement concerns fault or identity, such a testimonial statement is admissible only if the declarant testifies at trial and is subject to cross-examination." *Purcell*, 364 Ill. App. 3d at 297. The *Purcell* court then sanctioned the view adopted by the *In re T.T.* court and held that when determining whether a statement is testimonial or nontestimonial in nature, a court should focus "on the nature of the testimony rather than the official or unofficial status of the person whom the State called to testify to the declarant's out-of-court statement." *Purcell*, 364 Ill. App. 3d at 297.

In *People v. Stechley*, 225 Ill. 2d 246 (2007), our supreme court noted that the United States Supreme Court has "left for another day any discussion of rules for evaluating 'whether and when statements made to someone other than law enforcement personnel' [citation] or statements 'made in the absence of any interrogation' [citation] might be 'testimonial.'" *Stechley*, 225 Ill. 2d at 289-90. Then, our supreme court held that statements made to someone other than law enforcement personnel or government officers can be testimonial in nature. *Stechley*, 225 Ill. 2d at 291-92.

In answering the question of "how to determine whether statements are testimonial when they are made outside" of police interrogation, the *Stechley* court stated, "[T]he only proper

24

focus is on the declarant's intent: Would the objective circumstances have led a reasonable person to conclude that their statements could be used against the defendant?" *Stechley*, 225 Ill. 2d at 289. The *Stechley* court continued that, "[I]t is the declarant's perspective which is paramount in a testimonial analysis. *** Accordingly, in our view, the proper question is not whether the declarant actually did intend or foresee that his statement would be used in prosecution. Rather, the question is whether the objective circumstances indicate that a reasonable person in the declarant's position would have anticipated that his statement likely would be used in prosecution." *Stechley*, 225 Ill. 2d at 292.

Using the test announced by our supreme court in *Stechley*, and *Davis v. Washington*, 547 U.S. ____, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006), as our guide, we hold Hearn's statement to Lee was not testimonial in nature. In *Davis*, the Supreme Court held that statements made to a law enforcement official during the course of a 911 call were not testimonial in nature. *Davis*, 547 U.S. at ____, 165 L. Ed 2d at 240-41, 126 S. Ct. at 2277. This was so, reasoned the *Davis* Court, since the declarant made the statements during an ongoing emergency. *Davis*, 547 U.S. at ____, 165 L. Ed. 2d at 237-38, 126 S. Ct. at 2274. The *Davis* Court noted that while "one *might* call 911 to provide a narrative report of a crime absent any imminent danger [the declarant's]

25

call was plainly a call for help against a bona fide physical threat." (Emphasis in original.) *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. The *Davis* Court further noted that identifying one's assailant does not, in and of itself, render that statement testimonial in nature. *Davis*, 547 U.S. at ___, 165 L. Ed. 2d at 240-41, 126 S. Ct. at 2276-77. The *Davis* Court stated:

> "Third, the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." (Emphasis in original.) Davis, 547 U.S. at ___, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276.

Just as the declarant in *Davis*, Hearn was in need of protection from his assailant when he made the statement to Lee. He was also in dire need of medical attention. Had Hearn made the exact same statement to a 911 operator, *Davis* would mandate that we find the statement nontestimonial in nature. Using the *Stechley* "objective circumstances" test, we find that a

26

reasonable person shot five times who has just made his way to his aunt's house and who has not received protection from his assailant or medical attention would not have anticipated that the statement to his aunt would be used in prosecution.  He would, undoubtedly, have anticipated that identifying his assailant to his aunt would allow his aunt to take precautionary measures should the assailant also arrive at her residence. Therefore, Hearn's statement to Lee was nontestimonial in nature.

Courts agree that when an out-of-court statement is found to be nontestimonial, the "indicia of reliability" framework set forth in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), and traditional hearsay exceptions apply. *Purcell*, 364 Ill. App. 3d at 294; R.F., 355 Ill. App. 3d at 1000. *Crawford* clearly states that where "nontestimonial hearsay is at issue, it is wholly consistent within the Framers' design to afford the States flexibility in their development of hearsay law-as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

As noted in section 1 above, Hearn's statement to Lee falls squarely within this state's excited utterance exception to the hearsay rule.  Defendant argues, however, that even if we find the statement to be nontestimonial and no *Crawford* violation, it

27

was still reversible error to admit it. Defendant claims that his right to confrontation was still violated as Hearn was not "unavailable," yet his statement was allowed to be introduced into evidence without Hearn being called to testify. Defendant notes that Hearn was incarcerated at the time of the trial. Therefore, defendant claims that the State impermissibly circumvented his right to confrontation by introducing his statement to Lee while holding him in confinement. For authority supporting the conclusion that this amounted to reversible error, defendant cites Justice Thomas's dissenting opinion in *Davis v. Washington*, 541 U.S. at ____, 165 L. Ed. 2d at 244, 126 S. Ct. at 2280 (Thomas, J., dissenting), and *Barber v. Page*, 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968).

Defendant's arguments concerning the "availability" of Hearn are unavailing. It is true that the *Barber* Court held the State violated the defendant's right to confrontation when it was allowed to admit hearsay statements of someone incarcerated in a federal penitentiary without attempting to secure the declarant's presence at trial. *Barber*, 390 U.S. at 725, 20 L. Ed. 2d at 260, 88 S. Ct. at 1322. The statements made by the declarant in *Barber*, however, were made during a preliminary hearing in which the defendant was afforded no meaningful opportunity of cross-examination. *Barber*, 390 U.S. at 725, 20 L. Ed. 2d at 260, 88 S. Ct. at 1322. Undoubtedly, the statements at issue in *Barber* were

28

testimonial in nature and, therefore, pursuant to *Crawford*, could only be admitted today if the defendant were allowed a meaningful opportunity to cross-examine the declarant. But, to read *Barber* to hold, as defendant urges, that no hearsay statements are ever admissible if the declarant is incarcerated, or otherwise "available," is an untenable expansion of *Barber* which ignores other, more recent United States Supreme Court jurisprudence.

In *White v. Illinois*, 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992), the Court held that our supreme court correctly decided that the confrontation clause does not demand that "the prosecution must either produce the declarant at trial or the trial court must find that the declarant is unavailable" before admitting hearsay statements under the spontaneous declaration exception to the hearsay rule. *White*, 502 U.S. at 349, 116 L. Ed. at 854-55, 112 S. Ct. at 739. This is so, reasoned the *White* Court, because "where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *White*, 502 U.S. at 356, 116 L. Ed. 2d at 859, 112 S. Ct at 743. The Court specifically rejected an "unavailability rule" pertaining to spontaneous declarations and noted, "We *** see no basis *** for excluding from trial, under the aegis of the Confrontation Clause, evidence embraced within such expectations to the hearsay rule as those for spontaneous declarations."

29

*White*, 502 U.S. at 357, 116 L. Ed. 2d at 860, 112 S. Ct. at 743. Given the holding of *White*, we reject defendant's argument that his rights under the confrontation clause were violated when the State was allowed to introduce Hearn's excited utterance through Lee's testimony while Hearn was "available" to testify.

### III. Sufficiency of the Evidence

Defendant's final issue raised on appeal is that the evidence adduced at trial was insufficient to convict him of the first degree murder of Owens. He argues that, at best, the evidence indicates that he was the "most likely suspect, in the shooting of Owens," but it is totally circumstantial and fails to sufficiently prove he actually shot Owens. Defendant does not challenge his aggravated battery conviction on these grounds.

When reviewing a claim of insufficient evidence, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999). It is not the function of a court of review to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985).

Evidence was admitted at trial indicating that defendant initially informed police that he had no involvement in the shooting and was not at the scene during the time of the

30

shooting. Defendant later recanted that story and informed police that he was, in fact, at the scene when the shooting took place. In describing what took place during the incident, defendant told police that Owens shot Hearn three times while Hearn was in the backseat of the van and Owens was in the driver's seat. Once the first shot was fired, according to defendant, Randle took off running. Defendant was clear that only the four men were at the scene when the first shot was fired and only Hearn, Owens and defendant remained after the first shot was fired.

According to defendant, after Hearn was shot three times in the van, he exited the vehicle and chased Owens. During the chase, he was shot two more times. Hearn, then, after being shot five times, caught up to Owens, wrestled the gun away from him, and killed him almost instantaneously with a single shot.

Medical and forensic experts testified that the shooting simply could not have happened as defendant described. Hearn was not shot in the van, did not chase Owens, and did not struggle with Owens for the gun. Testimony indicated that Owens was found dead holding a cigarette and lighter in one hand. For the jury to believe defendant's version of the events, it would not only have to ignore all the physical evidence (as testified to by the various forensic experts) from the incident but also somehow conclude that Owens continued to hold a cigarette and lighter in

one hand as he struggled over a gun with a man he had just shot five times.  Moreover, the jury would have had to believe that Hearn, having just been shot five times, had the strength to chase down Owens, take the gun from him, and shoot him.

Defendant argues that proving he lied about the way events transpired does not equate to proving all the elements of an offense beyond a reasonable doubt.  We agree.  Defendant admits the *corpus delicti* of the murder of Owens was proven by the State, but contends that the State failed to offer sufficient evidence to prove he was responsible for or committed the murder of Owens.  We disagree.

The State introduced defendant's own statement in which he admitted that only Randle, Owens, Hearn, and he were at the scene when the first shot was fired.  A video surveillance tape confirmed that the four men were together approximately one hour prior to the shooting.  Defendant stated Randle did not fire the first shot and took off running after it was fired.  This left Hearn, Owens, and defendant as the only people at the scene of the crime when the remaining five shots were fired.  Witnesses Nimmers and Dixon testified that they heard one shot fired, followed a short time later by five rapidly fired gunshots.

No gunshot residue was found on the sleeves of Owens' jacket indicating that he did not fire even a single shot, let alone five shots into Hearn.  The physical evidence and witness

32

testimony certainly supports the State's theory that the first shot heard by Nimmers and Dixon was the single fatal shot fired into Owens and the five subsequent clustered shots were those which struck Hearn. Adding Hearn's statement that defendant was the shooter, we find sufficient evidence upon which a reasonable trier of fact could have relied to conclude that all the elements of the offense of murder were proven beyond a reasonable doubt.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

O'BRIEN and WRIGHT, JJ., concur.

33