No. 3–08–0692

Filed November 18, 2009

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2009

THE PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff-Appellee,

v.

DANIEL R. BELKNAP,

    Defendant-Appellant.

) Appeal from the Circuit Court
) for the 9th Judicial Circuit,
) McDonough County, Illinois
)
)
) No. 07–CF–251
)
)
) Honorable
) William D. Henderson,
) Judge, Presiding.

JUSTICE CARTER delivered the opinion of the court:

The defendant, Daniel R. Belknap, was convicted of first degree murder and endangering the life of a child in connection with the death of five-year old Silven Yocum in September 2006. 720 ILCS 5/9–1(a)(1), 12–21.6(a) (West 2006). On appeal, the defendant raises challenges to the sufficiency of the evidence, the trial court's failure to strictly comply with Supreme Court Rule 431(b) (Official Report Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007), the admission of certain testimony, and the court's ex parte communications with the jury. We reverse the defendant's convictions and remand for a new trial.

I. FACTS

The defendant was charged with first degree murder and endangering the life of a child. Prior to trial, the defendant filed several motions in limine to exclude certain evidence. These

motions included a motion to exclude the testimony or evidence of any statement of jailhouse informants Jeff Ahlers and Joseph Burgess and a motion to exclude certain testimony by paramedic Heather Connor as to statements made to her by the victim's mother, Erin Yocum.

The defendant's trial began on May 19, 2008, with jury selection. On that day, the court addressed the venire as a group. The court stated:

"Every defendant is presumed innocent until proven guilty by proof beyond a reasonable doubt. It is the burden of the State to prove their case by proof beyond a reasonable doubt.

The defendant is not required to testify or to offer any evidence on his behalf. If a defendant does not testify on his own behalf, you may not consider the fact that he didn't testify in deciding the question of his guilt or innocence."

The court then called groups of four potential jurors into the courtroom for questioning by the court and the parties. The court asked each small group of potential jurors whether they had read or heard any media reports about the case. In addition, the court asked whether they could set aside what they had learned from those accounts and decide the case based solely on the evidence presented in court. The court also asked whether the potential jurors had any bias or prejudice against a person simply because that person had been charged with a crime. Further, the court asked each small group of potential jurors whether they would apply the law as the court instructed it to be without regard to their own feelings.

Jury selection continued on May 20, 2008. Again, the court addressed the entire venire, stating:

"In a criminal trial in the United States in Illinois, the defendant is

2

presumed to be innocent. That presumption of innocence stays with him throughout the trial until you've heard the whole thing and actually make your decision and you decide whether he's innocent or not.

The standard of proof in a criminal trial is proof beyond a reasonable doubt, and that isn't defined any more than that. Proof beyond a reasonable doubt is the standard I'm sure the attorneys will talk to you about in their arguments.

In a criminal case, a defendant is not required to present any evidence. You merely stand mute and see what the State can prove. A defendant is not required to testify. He may. He doesn't have to. That's up to him. And if he doesn't testify under the constitutional system of this country, then that decision cannot be used as part of your decision-making process. If he testifies, you can consider what he says. If he doesn't testify, you don't go there."

The court also questioned the small groups of potential jurors, asking the same questions it had asked the previous day.

Following opening statements, the trial proceeded with the testimony of Erin Yocum. Erin testified that she was the mother of the victim, Silven Yocum. Silven was five years old at the time of her death in September 2006. In September 2006, Erin was dating the defendant. Erin and Silven did not live with the defendant, but they frequently stayed at the defendant's house. Silven had her own room at the defendant's house.

During the time period of Monday, September 4, 2006, through the morning of Friday, September 8, 2006, Erin did not notice anything unusual with Silven. Silven did not appear to be ill during this time. On Friday, September 8, Erin put Silven to bed at the defendant's home

3

between 9:00 and 10:00 p.m. At approximately 11 p.m., Erin left the house to buy some magazines. She was gone for an hour to an hour-and-a-half. When she arrived back at the defendant's home, the defendant was in the garage with a man she had never before met. Erin did not see anyone smoking methamphetamine, and she denied smoking methamphetamine at that time. Erin checked on Silven, who was sleeping. Erin went to bed at approximately 1:30 a.m. and awoke around 5 a.m. The defendant had not slept in the house the previous night and was still in the garage. Silven awoke shortly thereafter. There did not appear to be anything wrong with Silven at that time.

Later that morning of Saturday, September 9, 2006, Erin and Silven painted a doghouse. Silven, however, was not interested in painting, which Erin thought was unusual. Silven only wanted to sit on Erin's lap. At approximately 9 a.m., the defendant told Silven to go into the house to help him make breakfast. Silven did not want to go and cried. The defendant picked up Silven and carried her into the house. Erin followed 10 to 15 minutes later. Silven ate her breakfast, but did not want to do anything else. Erin thought that Silven was getting sick, as Silven was sniffling and coughing. Erin, herself, had a bad cold at the time.

After breakfast, Silven and the defendant went for a ride on his four-wheeler. Erin testified that they were gone for approximately 5 to 10 minutes, and that Silven appeared fine when they returned. Later that afternoon, Erin telephoned her brother and asked if his son, Brett, could come to the defendant's house and play with Silven. Erin requested that Brett come and play with Silven because Silven was unusually clingy that day. Erin then drove to her brother's home to pick up Brett, which took approximately 40 minutes. Silven did not go with her. After Brett arrived, he and Silven went to jump on the trampoline. Silven did not want to jump,

4

however.

Erin testified that Brett's father, Erik, was also present at the defendant's house on Saturday. Erik arrived at approximately 5:30 p.m. to take Brett to a birthday party. Silven went with Erik when he drove Brett to the party. Erik and Silven were gone for approximately a half-hour. When they returned, Silven did not want to eat the pizza that Erik had bought her. Silven sat on Erik's lap for about an hour and appeared to be sicker than she had been earlier that day. Erin testified that Silven did not have any energy throughout the day, that she did not want to eat and only wanted to cling to Erin.

At 7:30 p.m., Erik left the defendant's house to pick up Brett from the birthday party. Erin testified that Erik telephoned her soon after and told her that a wheel had come off his truck on his way to get Brett. Erin got into her car and left the house to find Erik. Erin testified that it took approximately 10 minutes to find Erik. They then returned to the defendant's house and the defendant went with Erik to go get Erik's truck. The defendant and Erik returned shortly, and Erik took Erin's car. The defendant left to pick up some food and medicine for Erin and Silven, returning at approximately 10 p.m.

Erin's testimony regarding when Silven went to bed that night is somewhat muddled. First, she testified that after she returned from picking up Erik she "went in the house with Silven." The defendant carried Silven into the house and put her to bed. Erin testified Silven appeared tired and sick at that time. A little later in her testimony, she testified that Silven was already in bed when Erin left the house to get Erik, and that Silven went to bed at 8:30 or 9 that evening. On cross-examination, she testified that the defendant took Silven into the house when Erin left to get Erik and that Silven was in bed when Erin returned to the house.

5

At 6:30 a.m. on Sunday, Erin awoke to use the restroom. Erin passed by Silven's room and heard her snoring. Erin thought that Silven was congested and sounded as if she was sleeping heavily. Erin did not go inside Silven's room and could not see Silven clearly because Erin was not wearing her glasses. Erin went back to bed and awoke again at 10 or 10:30 a.m. Silven was still sleeping and snoring. Erin was not feeling well, so she went back to bed again. Erin woke for the third time at noon when Erik called and told her he was coming to the house to get his truck. While Erin was on the telephone with Erik, the defendant yelled from Silven's room. Erin testified that she went to Silven's room and saw Silven having a seizure. Erin then called 911.

Initially, Silven was taken to McDonough District Hospital. Erin testified that the defendant accompanied her to the hospital, but that he left at some point to get clothing and insulin for Erin, who is diabetic. Erin testified that she made arrangements to meet the defendant at another location so that they could travel together to St. Francis hospital in Peoria, where Silven was transferred. Erin's parents drove her to the meeting place and Erin got into the defendant's vehicle. While they were driving, Erin told the defendant what Silven's doctor had told her about Silven's injuries. Erin testified that the doctor had told her that Silven had suffered blunt force trauma, that she was broken from head to toe with a broken sternum and punctured bowels. The doctor also told her that Silven had been tied at the ankles and sodomized. Later, it was determined that some of these statements by the doctor were not true. The defendant told Erin that he felt sick, and she told him to stop the car. Erin then left the defendant's vehicle and got into her parents' car to continue traveling to Peoria. The defendant did not go to the hospital in Peoria.

6

Erin testified that she had been interviewed by police officers several times since September 10, 2006. On September 15, 2006, Erin was interviewed by Detective Holt, who told her that he believed that either she, the defendant or Erik had hurt Silven. In January 2007, Sheriff Van Brooker requested a meeting with Erin. Erin informed the defendant of the request when the defendant telephoned her from the Tazewell County jail. Erin testified that the defendant told her not to meet with Van Brooker. Erin further testified that her phone conversation with the defendant had been recorded. That recording was played for the jury.

On cross-examination, Erin testified regarding another conversation with the defendant in January 2007. In that conversation, Erin and the defendant discussed their perception that the police were trying to pressure them into admitting that one of them had hurt Silven. The defendant told Erin that he did not know what had happened to Silven.

Erin testified that she did not strike Silven at any time during the time period of September 8, 2006, through September 10, 2006. Erin further testified that Silven showed her an injury to her ankle when Silven took a bath on Thursday, September 7, 2006. Silven told her that she had sustained the injury when she fell off the monkey bars and a boy fell on top of her. Erin did not notice any other injuries to Silven at the time, other than blisters on Silven's ankles. Silven had complained of headaches during the week before her seizure, which Erin attributed to Silven's new eyeglasses.

Erin also testified that she had recently completed a federal first-offender drug program in connection with federal drug charges. Erin was using methamphetamine in September 2006 and had been using the drug for approximately five years. At the time of trial, a child endangerment charge was pending against Erin in connection with Silven's death. A plea offer had been made

to Erin in exchange for her truthful testimony at the defendant's trial, but Erin had not accepted the plea offer. She testified that she did not testify because of the plea offer, but that she was testifying for Silven.

Brett Yocum Winters testified that he was six years old in September 2006. Brett testified that he visited Silven's house a few times in September 2006 and that he remembered jumping on the trampoline. Silven only jumped for a few seconds and then got off the trampoline because she did not feel well. Brett testified that Silven did not fall off the trampoline. Brett also testified that he, Silven and the defendant went for a ride on the four-wheeler. They rode on the four-wheeler slowly for about five minutes, and no one was hurt. Brett also testified that Silven complained that her head hurt.

Erik Yocum testified that he was Erin's brother and Brett's father. Erik testified that he was present at the defendant's home on Saturday, September 9, 2006, to pick up Brett, who was playing with Silven. Erik went to the defendant's house to get Brett and take him to a birthday party. Silven accompanied Erik when he took Brett to the party. Erik purchased some pizza and candy for Silven, but she did not eat them. Erik stayed at the defendant's house for a while with Silven, Erin and the defendant. Erik did not see anyone else at the house on that day.

When Erik left the house to pick up Brett from the party, his front left tire fell off. He called Erin, who found him and brought him back to the defendant's house. Erik did not see Silven at this time. Erik and the defendant retrieved a jack from the garage and then the defendant drove Erik back to his truck. After replacing the tire on his truck, Erik borrowed Erin's car and left to pick up Brett.

Erik testified that he telephoned Erin repeatedly on Sunday morning, but he did not reach

her until approximately 1 or 1:30 p.m. Erik bought some food for everyone and went to the defendant's house to fix his truck. When Erik arrived at the house, the defendant was standing on the porch waving Erik inside. Erik ran inside to Silven's bedroom and saw her on the bed. Erik, Erin and the defendant all attempted to awaken Silven. The emergency medical personnel arrived soon thereafter, and Erik went outside. Silven died a week later. Erik testified that the defendant did not attend Silven's funeral.

Erik also testified that he had used methamphetamine in the past, approximately once or twice per month. He stopped using methamphetamine right after Silven died. Erik testified that the effects of methamphetamine varied depending upon the amount of the drug ingested. When Erik took methamphetamine he could not sleep and sometimes did not sleep for two or three days.

Erik denied ever talking to Nathan Wallick about Silven's death. Erik denied telling Wallick that Silven had spoken to a DARE officer at school about the defendant's drug use. Erik also denied telling Wallick that the defendant beat Silven.

Aaron Wilson testified that he was a paramedic at McDonough District Hospital and that he was dispatched to the defendant's home at 1:31 p.m. on September 10, 2006. Wilson entered the house and went to Silven's bedroom, where Silven was laying on the bed. Erin was also present in the bedroom and told Wilson that Silven had been fine when she was put to bed at approximately 9 p.m. the night before. Wilson also saw the defendant in the hall outside Silven's bedroom, but did not see him in the room.

Wilson testified that Silven was unresponsive to stimuli, and her eyes were open, fixed to the right. Silven's hands were tightened in and her legs were turned out and down, in what

9

Wilson testified was a classic sign of a brain injury. Silven was also in slight respiratory distress. Wilson testified that Silven's blowing type of respiration was also a classic sign of brain injury. Upon examining Silven, Wilson observed that she appeared unkempt and dirty. Silven also had dried blood on her teeth and lip area. Wilson also observed numerous contusions to Silven's legs near her ankles. Wilson and the other medical personnel quickly determined that Silven needed to be taken immediately to the nearest trauma facility. In the emergency room of McDonough District Hospital, Wilson observed a bright red mark in the middle of Silven's back.

Sergeant John Carson of the McDonough County sheriff's office testified that he was dispatched to McDonough District Hospital on September 10, 2006, to investigate a suspected child abuse case. When Carson arrived, the emergency room personnel were performing advanced life support measures on Silven and preparing to transport her to a critical care center. Carson observed and photographed bruises on Silven's torso, hip, buttocks. He also observed a large abrasion and bruise on the middle of her back. The abrasion was approximately seven centimeters by five centimeters. Carson also observed dried blood on Silven's teeth, gums and cheek.

Carson also testified that he did not investigate the defendant's home on Sunday, September 10, 2006. Carson does not know whether any other police officer went to the defendant's home on September 10. Carson, Detective Holt and Chief Deputy Manser investigated the defendant's house on September 13 or 14, 2006, after obtaining consent from the defendant. Carson photographed the bottom of some shoes found in the house, looking for patterns consistent with the abrasion on Silven's back. Carson also collected the bedding from Silven's room and a shirt that Silven had worn on Saturday September 9, which were submitted

10

to the Illinois state crime laboratory for analysis. The analysis report stated that patterns of unknown origin were found on the shirt and that a shoe could not be eliminated as the possible source of the pattern. The report also requested possible shoe patterns be submitted for comparison. No such samples were sent to the laboratory.

Carson also observed that the windows of the house were either nailed or sealed shut. Carson did not find any evidence of forced entry to the house. Neither the defendant nor Erin reported any missing items.

Dr. Khaled Dabash testified that he was Silven's pediatrician and that he was present in the emergency room on September 10, 2006, when Silven arrived via ambulance. Silven was unconscious and still seizing when she arrived. Silven did not have a fever, and there were no signs of infection. Her body was in contracture, indicating a central nervous system insult. Dr. Dabash observed bruising and marks on Silven's body, which he believed were indicative of abuse, so he ordered a CT scan of her head. Dr. Dabash observed the CT scan as it was being performed and found complete right parietal hematoma, which means blood was covering the entire right side of Silven's brain. Dr. Dabash testified that he had no doubt that this injury was caused by blunt head trauma. Dr. Dabash also suspected a sternal fracture. Dr. Dabash ordered a life flight that took Silven to Saint Francis Medical Center in Peoria.

Dr. Dabash opined that Silven's injuries were recent because her brain had not yet swelled enough to cause herniation. Rather, herniation was beginning to occur at the hospital, and Dr. Dabash gave her a drug to reduce the swelling. Dr. Dabash testified that when a child experiences blunt force head trauma, the brain swells over time until the compression of blood on the brain causes seizures. Dr. Dabash further opined that Silven had experienced blunt force

11

trauma to her head within 24 hours at the least before she arrived at the hospital.

Heather Connor testified that she was a paramedic at McDonough District Hospital in September 2006. Connor was part of the crew that met the ambulance carrying Silven when it arrived at the hospital. Connor was with Silven throughout most of Silven's time at that hospital, and was present when Dr. Dabash informed Erin and the defendant that Silven's brain was bleeding. Erin told the doctor that Silven had not been with anyone other than Erin and the defendant. Connor also testified that Erin held Silven's hand and rubbed her hair, and that the defendant stood with his back to Silven, mostly looking at Erin. Connor also testified that Erin was very distraught and seemed confused by the information given to her by Dr. Dabash.

Connor also retrieved Erin from a waiting room to take her back to Silven after Silven had been prepared for the flight to Peoria. Connor testified that Erin was crying and that she stopped while they were walking. Connor went back to her, and Erin asked, "Did he hurt her?" Connor replied, "I don't know." Connor testified that Erin then said, "I will never trust her with him again." After they returned to Silven's bedside, the defendant came into the room. Connor testified that he told Erin that he was going to his home to get Erin's clothes and medicine. Erin pulled away from him.

Jill Goodpasture testified that in September 2006 she lived with Scott Kepple, in a home approximately five miles from the defendant. Goodpasture testified that she saw Silven on Tuesday, September 5, 2006, and Wednesday, September 6, 2006. On both occasions, Silven appeared fine. Goodpasture also testified that she, Kepple, Erin and the defendant smoked methamphetamine on both days.

Goodpasture testified that she next saw the defendant on Sunday, September 10, 2006,

12

when he came to her home and they smoked methamphetamine. Goodpasture testified that the defendant told her he did not know what had happened to Silven and did not tell her any details about Silven's injuries. The defendant was upset and said, "I don't understand why they don't want me there." The defendant also asked Goodpasture if she thought they would call the police.

Goodpasture also testified that in September 2006 she, Erin and the defendant smoked methamphetamine together three or four times a week. Silven would not be in the room where they smoked the drug, but would be somewhere in the same house. Goodpasture never noticed the defendant experience mood swings when he smoked methamphetamine. At the time of trial, Goodpasture no longer used methamphetamine. She testified that she was arrested in 2006 for conspiracy to distribute methamphetamine and successfully completed a first-offender drug program in November 2007.

Matthew Hocker testified that he was the defendant's cousin. The defendant arrived at Hocker's home at approximately 8:30 p.m. on September 10, 2006. Hocker asked the defendant if he knew what had happened to Silven, and the defendant said, "No." Hocker testified that the defendant also said, "If I go home, are the police going to come knocking on my door tonight?"

Dr. Julian Lin testified the he was a pediatric neurosurgeon at St. Francis Children's Hospital in Peoria, Illinois, on September 10, 2006. Dr. Lin examined Silven sometime after 5 p.m. on that day. Silven was in a coma. Soon after, Dr. Lin performed surgery on Silven to remove a very large blood clot on the surface of the right hemisphere of her brain. Dr. Lin successfully removed the clot, but Silven remained in a coma. A CAT scan revealed that her brain had swelled and efforts to control the swelling were unsuccessful. Over the next week,

13

Silven did not improve, eventually had no brain activity and died on September 16, 2006.

Larry Leasman testified that he went to the defendant's home at approximately 1 a.m. on Saturday, September 9, 2006. The defendant was in the garage, and Erin arrived at the house shortly after Leasman. Leasman testified that he and the defendant smoked methamphetamine in the garage that night and that he had smoked methamphetamine with the defendant approximately 10 or 12 times in the past. Leasman also testified that he purchased methamphetamine from the defendant that night. Leasman could not recall whether Erin smoked methamphetamine that night. On cross-examination, Leasman testified that he thought that Erin smoked methamphetamine that night, but he was not 100% sure.

Jeff Ahlers testified that at the time of trial he was incarcerated in the Illinois Department of Corrections and that he had been convicted of several felonies in several different counties. In addition, Ahlers had three cases in three counties pending at that time, and he had been in prison four times. Further, Ahlers testified that he had been addicted to cocaine for 25 years.

Ahlers testified that he met the defendant in the Tazewell County jail in September 2007. Ahlers testified that he and the defendant became friends in jail. The defendant described his use of methamphetamine and told Ahlers that he would not sleep for days. Ahlers also testified that the defendant also discussed Silven once. Ahlers testified that the defendant told him that he had been awake for many days due to methamphetamine use and that the defendant had found out that Silven had spoken to a DARE officer about the defendant's drug use. The defendant told Ahlers that he was infuriated and that he pushed Silven and hit her in the head. Ahlers also testified that the defendant told him that Erin was present when he hit Silven.

Ahlers was thereafter transported to the McDonough County jail in connection with

14

criminal charges then pending in McDonough County. While being transported, Sheriff Van Brooker asked if Ahlers knew the defendant and if Ahlers knew anything about Silven's death. Ahlers acknowledged meeting the defendant, but told Sheriff Van Brooker that he did not know anything about Silven's death.

Ahlers testified that he met Nathan Ralph and Nathan Wallick after he arrived at the McDonough County jail and discussed with them the defendant's role in Silven's death. Ahlers discussed the matter with Ralph and Wallick prior to making a statement to the police in December 2007, that the defendant had confessed to him that he had hit Silven. Ahlers testified that he asked Ralph for advice as to whether Ahlers should tell the police about the defendant's statements to him. Ahlers testified that he was concerned about talking to police because his life would be in jeopardy in prison for being a snitch.

Dr. Bryan Mitchell testified that he was a forensic pathologist and that he conducted an autopsy on Silven on September 18, 2006. Dr. Mitchell observed bruises to the right side of Silven's head, abrasions on the back of her head, a bruise on her right shoulder, and bruises and abrasions on her right foot. Dr. Mitchell testified that these injuries were caused by blunt force trauma.

Upon internal investigation of Silven's scalp, Dr. Mitchell observed a bruise inside the scalp that extended to Silven's occipital bone. This bruise was located under the abrasions seen on the outside of Silven's head. Dr. Mitchell also observed that blood had collected under a membrane on the right side of Silven's brain and that the brain was very swollen. Dr. Mitchell testified that the injuries to Silven's head and brain were consistent with blunt force trauma. Based upon his examination, Dr. Mitchell testified that there were five distinct areas of blunt

force trauma to Silven's head. Dr. Mitchell further testified that these injuries were not likely to be caused by falling off a trampoline or falling down once. Brain injuries, such as those seen in Silven, would not necessarily result in the immediate display of symptoms, such as unconsciousness. Dr. Mitchell opined that Silven sustained the blunt force trauma 12 to 24 hours before she began having seizures. Further, Dr. Mitchell opined that Silven died as a result of complications of closed-head injuries due to blunt force trauma caused by blows delivered directly to her head, or by blows to the head followed by her striking another object. The blows could have been delivered by a human hand, or possibly by a foot. Dr. Mitchell also testified that some of the symptoms of a brain injury are lethargy, loss of appetite, and loss of interest in activities.

Joseph Burgess testified that at the time of trial he was being held at the Tazewell County jail on pending felony charges. Burgess testified that he met the defendant in jail in March 2007 and began sharing a cell with him in April 2007. He shared a cell with the defendant for four to five months; they were assigned new cellmates when they were caught making jailhouse alcohol. In July 2007, the defendant told Burgess that it would have almost been Silven's birthday if she were alive. Burgess testified that the defendant paced their cell and then said, "That little shit was going to tell on me if I didn't stop." After a pause, the defendant said, "I just slapped her. Things got way out of hand."

Burgess also testified that approximately two weeks later he was present during a conversation between the defendant and another person regarding Silven. The defendant told that person that Silven hit her head while jumping on a trampoline. Burgess testified that the defendant looked at him, winked and said, "Isn't that right, Burgess?" Burgess testified that he

16

did not make a statement to the police regarding the defendant until January 5, 2008.

Denise Daugherty testified that she was a reading program assistant at Lincoln School in September 2006, and worked with Silven's kindergarten class. Daugherty testified that Silven did not appear sick or complain of any ailments on September 8, 2006. Silven drew a picture of herself and did not have any difficulty in following instructions or completing the project. Daugherty also testified that she did not know whether a DARE officer had visited the kindergarten class at any time prior to September 8, 2006, but that she thought that the DARE officer usually visited the school in the middle of the school year.

Sherri Moon testified that she was Silven's kindergarten teacher at Lincoln School in September 2006. Silven did not have difficulty completing her tasks on September 8, 2006. Silven did not appear ill that week, nor did she complain of headaches. Moon testified that she was not aware of any playground accidents the week of September 5 through September 8, 2006. Moon did not recall a DARE officer visiting the school before September 8, 2006.

Nathan Ralph testified that he was Jeff Ahlers' cellmate in October 2007 in the McDonough County jail. Prior to his testimony, the parties engaged the court in a discussion over Ralph's expected testimony. Defense counsel stated he was concerned that Ralph's testimony was going to violate an order previously granted that excluded Ralph's hearsay testimony and requested an offer of proof. The State represented that it was not going to elicit the contents of any conversation between Ralph and Ahlers.

"THE COURT: And you're not offering any hearsay under an exception. Is that my understanding?

THE STATE: No, just his knowledge--

THE COURT: That a conversation occurred between Ahlers and this witness.

THE STATE: Yes."

Ralph testified that he discussed the defendant with Ahlers in October 2007. The State then asked Ralph whether Ahlers discussed with him "whether he may have had any information." The defendant objected, and the court sustained the objection. The State then asked Ralph, "And did you have, back in October when you first met with Mr. Ahlers, did he discuss with you whether he wanted to come forward with some information?" The defendant objected again, and the court overruled the objection. Ralph asked the State to repeat the question. The State asked, "Did Mr. Ahlers confide in you that he had some reservations about coming forward with some information?" Ralph answered, "Yes."

Dr. Larry Blum testified that he was a forensic pathologist and that he reviewed Silven's autopsy protocol, photographs from the autopsy and hospital and other reports associated with Silven's death. Based upon his review of the materials, Dr. Blum testified that Silven died from a closed-head injury that resulted in subdural hemorrhage and brain swelling. Dr. Blum opined that Silven sustained the head injury sometime between Saturday morning and Sunday afternoon when she was found seizing. Dr. Blum also opined that Silven's injuries were not accidental but had been inflicted by a blunt instrument.

Michael Green testified that he was an assistant State's Attorney in Tazewell County. Green testified that he was assigned to prosecute a case against Joseph Burgess. Burgess was charged with aggravated arson, a Class X felony, among other felonies. Green testified that Burgess had been offered a plea agreement of a 22-year cap in exchange for his guilty plea to

18

aggravated arson. Burgess would still have a sentencing hearing and could offer in mitigation evidence that he helped law enforcement solve other crimes.

Sergeant Richard Johnston testified that he worked as a correctional officer at the Tazewell County jail. Johnston testified regarding the security cameras at the jail. Johnston also testified that to his knowledge no one had successfully made jailhouse alcohol at the new Tazewell County jail. Johnston also investigated the incident involving Burgess's attempt to make jailhouse alcohol. Based upon his investigation, Johnston did not think that Burgess had made jailhouse alcohol in the past.

Deputy Sheriff Steven Holt of the McDonough County sheriff's office testified that he was the lead investigator into Silven's death. At the hospital on September 10, 2006, Deputy Holt spoke to Dr. Dabash. Deputy Holt testified that Dr. Dabash told him that Silven's injuries were 10 to 12 hours old and no older. Deputy Holt also testified that he did not make any attempts to get a search warrant for the defendant's home on September 10, 2006, nor did he send any officers to secure the house.

Deputy Holt testified that he and other officers searched the defendant's home on September 12, 2006, pursuant to the defendant's consent. Deputy Holt testified that photographs were taken that day of shoes found in the residence, but that the photographs were not sent to the state laboratory for comparison to the pattern found on Silven's shirt. Deputy Holt further testified that he interviewed Erin numerous times and that he told her that he believed either she, the defendant or Erik had beaten Silven. As investigators interviewed people in connection with Silven's death, references to methamphetamine and other drugs were numerous. The sheriff's office contacted the federal authorities to investigate the drug allegations. Deputy Holt was not

19

involved in the drug investigation but he was aware of it. Through these investigations, Deputy Holt became aware that the defendant used and sold methamphetamine.

Deputy Holt also testified regarding rumors of a party at the defendant's house on Saturday, September 9, 2006. However, no one ever reported actually being present at the rumored party, and the defendant and Erin denied that there was any party. Deputy Holt also testified regarding a taped conversation between Erin and the defendant while the defendant was in jail. In that conversation, Erin refers to other people who may have come to the defendant's home on Saturday. However, Deputy Holt was not able to ascertain who these other people may have been. Deputy Holt testified that Erin told him that the only adults present at the defendant's home the weekend in question were herself, the defendant and her brother Erik. Deputy Holt also testified that he thought that Erin put Silven to bed on Saturday night.

The defendant testified that he met Erin in February 2006 and that Erin and Silven began spending the night at his house in late April or early May 2006. Erin and Silven stayed at the defendant's house three or four nights per week.

The defendant testified that on Friday, September 1 through Monday, September 4, 2006, he and Erin participated in a yard sale in Colchester, Illinois, and periodically smoked methamphetamine. Silven was with Erin's mother that weekend. On Monday, September 5, 2006, the defendant and Erin awakened at approximately 9 a.m. when Scott Kepple and Jill Goodpasture came into his house crowing like a rooster. The defendant testified that they all went back to Colchester and smoked more methamphetamine. Later, he and Erin picked up Silven and brought her back to the defendant's home.

On Tuesday, September 5, 2006, the defendant and Erin drove Silven to school in the

20

morning. During the day, the defendant and Erin smoked more methamphetamine. On Wednesday, Kepple and Goodpasture came to the defendant's house in the evening, and they all smoked methamphetamine while Silven watched a movie. The defendant testified that no one ever smoked methamphetamine in front of Silven when the defendant was present. He and Erin did not sleep Wednesday night. The defendant testified that he also smoked methamphetamine on Thursday.

The defendant testified that on Friday, September 8, 2006, Erin went to the store sometime after 11 p.m., after she put Silven to bed. At approximately midnight, Larry Leasman arrived at the defendant's house. The defendant testified that he and Leasman smoked methamphetamine in the defendant's garage. The defendant also testified that Leasman went into the house once to use the bathroom.

The defendant slept on a futon in the garage on Friday night and awoke sometime after 5 a.m. on Saturday when Erin came out to the garage. Silven came out to the garage shortly thereafter. Before Silven came outside, the defendant and Erin were preparing to smoke methamphetamine. The defendant then took Silven inside the house to cook breakfast. Silven did not want to go with the defendant but Erin encouraged her to go, telling her it would be fun. Silven did not cry, and the defendant did not carry her into the house. The defendant and Silven made breakfast, and 10 minutes later, Erin came in the house.

The defendant testified that Silven complained once or twice of a headache on Saturday. The defendant assumed that the headache was due to Silven's new glasses. The defendant also testified that Silven did not appear to be as active as normal on Saturday and that Silven wanted to be with Erin most of the day. Sometime Saturday morning, the defendant and Silven went on

21

a five-minute ride on the defendant's four-wheeler. The defendant testified that nothing happened on that ride that would have caused any injury to Silven.

That afternoon, Erin put Silven to bed because Silven was not feeling well that day. Erin then went to pick up Brett. Erin was gone for approximately 45 minutes to an hour. The defendant testified that he went inside the house to take a shower while Erin was gone, and he saw Silven sleeping. When Brett arrived, he and Silven went outside to jump on the trampoline. Silven did not jump for long and then sat down on a chair to watch Brett.

That night, Silven got ready for bed and the defendant tucked in her blankets. On cross-examination, he testified that both he and Erin put Silven to bed that night. The defendant testified that he did not see Silven again until Sunday. The defendant denied smoking any methamphetamine on Saturday and testified that he did not see Erin smoke any of the drug that day.

The defendant testified that after Silven went to bed, Erik called because his truck had lost a tire. Erin went to pick up Erik and brought him back to the defendant's house. The defendant testified that Erin was gone for approximately five minutes and he stood outside waiting for them to return. The defendant then went back to the truck with Erik to fix the tire. The defendant testified that he and Erik were gone for approximately 15 minutes. Erik left again at around 8 p.m. After Erik left, the defendant noticed that Erin looked sick. The defendant told Erin to go lie down and he left to get food and medicine for Erin and Silven. The defendant left at 8:30 p.m. and returned at approximately 10 p.m. The defendant called Erin's cell phone when he got to her house to retrieve the medicine. He called her three times at approximately 9:35 p.m., but Erin did not answer the telephone. The defendant left Erin's house and went to buy fast

22

food. Erin was sleeping when he returned home. Silven was also sleeping, and Erin told the defendant not to wake her.

The defendant went to bed at 10:30 p.m., and Erin awakened him at 1 p.m. on Sunday. The defendant thought it unusual that Silven was still asleep. The defendant looked into Silven's room on his way to the bathroom and noticed that Silven was not fully covered with her blanket, which he also thought was unusual. The defendant walked into her room and heard Silven wheezing. The defendant yelled for Erin and they both tried to wake up Silven.

The defendant drove Erin to the hospital. The defendant testified that he does not remember much about his time at the hospital and that he does not remember turning his back on Silven. The defendant also did not remember telling anyone that Silven had fallen at school. At some point, the defendant went home and got Erin's clothes and glucose pills from the closet in Silven's room. On his way back to the hospital, Erin telephoned and told him that she and her parents were driving to Peoria. They made arrangements to meet along the route to Peoria, and Erin got into the defendant's vehicle. The defendant testified that his conversation with Erin regarding the doctor's description of Silven's injuries was upsetting. Erin told him to pull over the vehicle. He did, and Erin's mother approached the car and told Erin to get into her car. Erin's mother told the defendant to go home and ride to the hospital with his parents. The defendant went home, but was unable to contact his parents. The defendant testified that Erin's mother telephoned him and told him that they did not want him at the hospital. The defendant did not go the hospital in Peoria.

That evening, the defendant went to Kepple and Goodpasture's home and smoked methamphetamine. The defendant testified that he told Kepple and Goodpasture that he did not

23

know why Erin's family did not want him at the hospital. The defendant did not remember asking them if they thought someone was going to call the police, but testified that he could have made such a statement due to his impression that Erin's mother was accusing him of hurting Silven. The defendant did not remember making a similar statement to Hocker that same evening. The defendant did not attend Silven's funeral because Erin and members of her family told him not to come to the funeral.

The defendant testified that when he smoked methamphetamine he felt alert, awake and focused. The defendant felt tired and would sleep for a long time when he was "coming down" from the influence of the drug. The defendant testified that he never locked the doors of his house. In addition, the defendant testified that the windows were not nailed shut. There were two windows in Silven's room.

The defendant further testified that Silven never said anything to him to indicate that she knew that he or her mother were using drugs. Silven never said anything to the defendant about a DARE officer, nor did she ever threaten the defendant that she was going to tell someone about his drug use. The defendant testified that he told Erin not to go to the sheriff's office because the police were harassing Erin, and he did not want Erin to become upset by the questioning.

The defendant testified that at the time of trial he was serving a sentence for a federal drug conviction. The defendant went to the police and confessed regarding his involvement with methamphetamine and subsequently pled guilty to charges in federal court. The defendant was arrested on January 10, 2007, and placed in the Tazewell County jail. The defendant met Jeff Ahlers at an Alcoholics Anonymous meeting in the jail. The defendant testified that he and Ahlers were not friends and never discussed their families. The defendant also denied ever

24

discussing Silven or her death with Ahlers.

The defendant testified that Burgess had been his cellmate but denied making jailhouse alcohol with him. The defendant discussed Erin and Silven with Burgess and showed him pictures. The defendant denied ever telling Burgess that Silven was going to tell someone about his drug use or that he slapped her and things got carried away. The defendant also testified that he never winked at Burgess while telling another inmate about Silven's death.

The defendant testified that the week before his testimony at trial he was being held at the McDonough County jail and saw State's Attorney Hoyle visit the jail. The defendant testified that Hoyle met with Ahlers in the hallway near the defendant's cell. Hoyle told Ahlers that he had brought Ahlers a copy of his statement and the questions that Hoyle was going to ask him at trial. Hoyle also told Ahlers to say that the defendant struck Silven in the face, rather than use the word "punched." The defendant testified that Hoyle also met with Burgess that day and told him that he had brought Burgess a copy of his statement and the questions Hoyle would ask him at trial. Hoyle also told Burgess that he was concerned with one aspect of Burgess's statement and told him that Burgess needed to have his statement straight. The defendant testified that Burgess then said, "Well, I'll say whatever you want me to say if you're gonna help me out with my case." Hoyle told him not to worry about that.

The record also contains a bystander's report regarding the facts surrounding two questions submitted by the jury during its deliberations. First, the jury requested transcripts of the testimony of Drs. Blum and Mitchell. The court responded, via written note, that the transcripts of the testimony were not available and instructed the jurors to use their best recollection of the testimony. The attorneys for the State and the defendant were not consulted

25

prior to the court's response to the jury. However, the attorneys concurred with the court's response upon being notified. The defendant was not present, and his presence was not discussed.

Second, the jury asked whether the court could define "great bodily harm." The court conferred in chambers with defense counsel and the State's Attorney regarding this request. The court answered the jury via handwritten note, stating "No." The defendant was not present during the conference, and his presence was not discussed.

The jury found the defendant guilty of first degree murder and endangering the life of a child. On June 27, 2008, the defendant filed a motion for new trial. The defendant raised a number of purported errors in that motion, including (1) the trial court erred by denying his motion to exclude certain testimony of Heather Connor; (2) the trial court erred by denying his motion to exclude the testimony of certain jailhouse informants; (3) the trial court erred by failing to conduct a pretrial hearing to determine whether the informants' testimony was reliable; (4) the trial court erred by allowing certain testimony of Nathan Ralph; (5) the court erred by communicating with the jury outside of the defendant's presence; (6) the court erred by failing to strictly comply with Supreme Court Rule 431(b); and (7) the evidence was insufficient to prove him guilty beyond a reasonable doubt. The motion for new trial was denied. The defendant was sentenced to 30 years' imprisonment for first degree murder and a concurrent term of 10 years for endangering the life of a child. The defendant now appeals his conviction.

II. ANALYSIS

A. Sufficiency of the Evidence

First, the defendant claims that the State did not present sufficient evidence to prove he

was guilty beyond a reasonable doubt of first degree murder. When reviewing a challenge to the sufficiency of the evidence, the reviewing court's function is not to retry the defendant. People v. Milka, 211 Ill. 2d 150, 178, 810 N.E.2d 33, 49 (2004). Rather, we must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. People v. Collins, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." People v. Bush, 214 Ill. 2d 318, 326, 827 N.E.2d 455, 460 (2005). This standard of review applies, " 'regardless of whether the evidence is direct or circumstantial [citation], and regardless of whether the defendant receives a bench or jury trial [citation].' " People v. Wheeler, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007), quoting People v. Cooper, 194 Ill. 2d 419, 431, 743 N.E.2d 32 (2000). The trier of fact determines the credibility of the witnesses, the weight to be given to testimony, and the reasonable inferences to be drawn from the evidence. People v. Saxon, 374 Ill. App. 3d 409, 416, 871 N.E.2d 244, 250 (2007). "A reversal is warranted only if the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt as to defendant's guilt." Saxon, 374 Ill. App. 3d at 416, 871 N.E.2d at 250.

" 'A conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it.' " People v. Patterson, 217 Ill. 2d 407, 435, 841 N.E.2d 889, 905 (2005), quoting People v. Williams, 40 Ill. 2d 522, 526, 240 N.E.2d 645 (1968). "Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution." People v. McDonald, 168 Ill.

2d 420, 447, 660 N.E.2d 832, 843 (1995). "When weighing the evidence, the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." McDonald, 168 Ill. 2d at 447, 660 N.E.2d at 843.

A person commits first degree murder if he performs the acts that cause the death of another with the intent to kill or do great bodily harm to that individual. 720 ILCS 5/9–1(a)(1) (West 2006). The defendant was charged with striking Silven in the head and shoving her with his hands with the intent to do great bodily harm to her, thereby causing her death.

The undisputed medical evidence in this case established that Silven died from blunt head trauma. Drs. Mitchell and Blum agreed that Silven had sustained the blows to her head within the 24 hours before she was found having seizures on Sunday, October 10, 2006. Dr. Dabash testified that Silven had sustained the injuries leading to her death at least 24 hours before she was found seizing. In addition, Dr. Dabash testified that he believed that Silven's injuries were the result of child abuse. Likewise, Drs. Mitchell and Blum both opined that Silven's injuries were not accidental, but had been intentionally inflicted by an instrument, which could have been a human hand or foot.

In the 24 hours before Silven was found having seizures, she was at the defendant's home with Erin and the defendant. During that same period, she was left alone with the defendant when Erin left to pick up Brett and later to pick up Erik. In addition, Erin testified that the defendant put Silven to bed on Saturday night. The defendant also testified on direct examination that he tucked Silven into bed that night. The defendant was also alone with Silven on Friday night while Erin went to buy magazines.

28

The State also presented evidence that the defendant made statements from which a reasonable jury could infer consciousness of guilt. See People v. Robinson, 391 Ill. App. 3d 822, 836, 909 N.E.2d 232, 246-47 (2009). Jill Goodpasture testified that the defendant was concerned that someone was going to call the police on Sunday, October 10, 2006. Matthew Hocker testified that the defendant expressed concern that the police were going to arrest him.

Further, the State presented evidence that the defendant had a motive for hitting Silven. Jeff Ahlers testified that the defendant believed Silven had spoken to a DARE officer about the defendant's drug use. Similarly, Joseph Burgess testified that the defendant told him that Silven "was going to tell on me if I didn't stop." Finally, Ahlers and Burgess both testified that the defendant admitted to them that he had hit Silven. Viewing this evidence in the light most favorable to the State, we conclude that a reasonable jury could have found the defendant guilty of first degree murder beyond a reasonable doubt.

Next, the defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of endangering the life or health of a child. 720 ILCS 5/12–21.6(a) (West 2006). The defendant was charged with wilfully causing or permitting Silven to be placed in circumstances that endangered her life or health in that the defendant used illegal narcotics and failed to provide necessary care and medical attention for Silven, which was a proximate cause of Silven's death. Ahlers testified that the defendant had been taking methamphetamine and had not slept for a few days when he hit Silven in the head. The defendant also told Ahlers that Silven had been hurt when he hit her. The medical evidence showed that Silven had been hit in the head five times, and that one of the bruises extended through Silven's scalp to her occipital bone. Further, Silven was hit so hard as to cause bleeding in her brain and swelling of the brain,

29

leading to her death. Thus, the evidence was sufficient to prove the defendant guilty of endangering the life or health of a child.

### B. Supreme Court Rule 431(b)

The defendant contends that the trial court failed to strictly comply with Supreme Court Rule 431(b) because the potential jurors were not given an opportunity to respond to questions regarding their understanding and acceptance of the principles set forth in that rule. The defendant argues that this error violated his constitutional right to a fair trial. The defendant also maintains that the court's error was not harmless. The State agrees with the defendant that the court did not substantially comply with Rule 431(b). However, the State argues that the court's error was harmless.

Supreme Court Rule 431(b) was passed to ensure compliance with the supreme court's decision in People v. Zehr, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984). Zehr held that it was reversible error where the trial court refused to ask questions proffered by the defendant concerning the presumption of innocence and the State's burden to prove the defendant guilty beyond a reasonable doubt, and the subject matter of those questions was not otherwise included during voir dire. Zehr, 103 Ill. 2d at 476-78, 469 N.E.2d at 1063-64. The rule was amended in 2007, deleting the phrase "If requested by the defendant," from the beginning of the paragraph. Effective May 1, 2007, Rule 431(b) provides:

> "The court shall ask each potential juror, individually or in a group,
> whether that juror understands and accepts the following principles: (1) that the
> defendant is presumed innocent of the charge(s) against him or her; (2) that before
> a defendant can be convicted the State must prove the defendant guilty beyond a

30

reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."

Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431, eff. May 1, 2007.

" 'The supreme court rules are not merely suggestions to be complied with if convenient but rather obligations which the parties and the courts are required to follow.' " People v. Reed, 376 Ill. App. 3d 121, 125, 875 N.E.2d 167, 171 (2007), quoting Medow v. Flavin, 336 Ill. App. 3d 20, 36, 782 N.E.2d 733, 746-47 (2002). We review de novo issues concerning the application of a supreme court rule. Reed, 376 Ill. App. 3d at 125, 875 N.E.2d at 171.

The parties appear to argue this issue as an issue of harmless error. Our review of the record, however, indicates that the proper framework for the analysis of this issue is the plain error rule. To properly preserve an issue for appellate review, the defendant must object at trial and raise the issue in a posttrial motion. People v. Allen, 222 Ill. 2d 340, 350, 856 N.E.2d 349, 351 (2006). Although the defendant in this case did raise this issue in his motion for new trial, the defendant did not object during voir dire to the court's failure to strictly comply with Rule 431(b). Thus, the issue was forfeited.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). "The plain-error doctrine does not instruct a reviewing court to consider all forfeited errors." People v. Herron, 215 Ill. 2d 167,

31

177, 830 N.E.2d 467, 474 (2005). A reviewing court will reach a forfeited error affecting substantial rights in two circumstances. Herron, 215 Ill. 2d at 178, 830 N.E.2d at 475. First, the court may consider a forfeited error "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." Herron, 215 Ill. 2d at 178, 830 N.E.2d at 475. Second, a reviewing court may consider a forfeited error "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." Herron, 215 Ill. 2d at 179, 830 N.E.2d at 475. In other words, there are two categories of plain error in Illinois: (1) prejudicial errors, which are "errors that may have affected the outcome in a closely balanced case"; and (2) presumptively prejudicial errors, which are "errors that may not have affected the outcome, but must still be remedied." Herron, 215 Ill. 2d at 185, 830 N.E.2d at 478-79. The burden of persuasion remains with the defendant in both instances. Herron, 215 Ill. 2d at 187, 830 N.E.2d at 480.

The first step in any plain error analysis is to determine whether clear or obvious error occurred. People v. Piatkowski, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Here, the trial court informed the jury venire of the principles set forth in Rule 431(b) but did not provide the jurors with an opportunity to respond to questions regarding whether the jurors understood and accepted the principles. Because Rule 431(b) requires the court to ask these questions of potential jurors, the court erred by neglecting to ask the jurors if they understood and accepted each of the principles listed in the rule.

Our conclusion that an error occurred here does not end our analysis, however. Piatkowski, 225 Ill. 2d at 566, 870 N.E.2d at 411. Next, we must determine whether the defendant has met his burden to show that either the evidence against him was closely balanced

32

or that the error was so serious that he was denied a substantial right. Piatkowski, 225 Ill. 2d at 566, 870 N.E.2d at 411. In this case, the evidence against the defendant was closely balanced. "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." Piatkowski, 225 Ill. 2d at 566, 870 N.E.2d at 411. Thus, while we have determined that the State provided sufficient evidence to find the defendant guilty beyond a reasonable doubt, the evidence was not overwhelming. The only direct evidence tying the defendant to Silven's death was the testimony of jailhouse informants Burgess and Ahlers. Our supreme court has stated that the credibility of informant testimony is a matter for a jury and can be the basis for a guilty verdict. People v. Manning, 182 Ill. 2d 193, 210-11, 695 N.E.2d 423, 431 (1998). However, such testimony should also be treated with caution. People v. Williams, 65 Ill. 2d 258, 267, 357 N.E.2d 525, 529-30 (1976).

Burgess and Ahlers each testified that the defendant, at separate times, confessed that he hit Silven preceding her death. The defendant denied making any such statements. The remaining circumstantial evidence against the defendant tends to prove that he had an opportunity and a motive for hitting Silven. However, that circumstantial evidence alone was not sufficient to prove the defendant guilty beyond a reasonable doubt of the crimes charged. In these circumstances, we conclude that the evidence against the defendant was closely balanced.

Therefore, the trial court's error in this case prejudiced the defendant. In Herron, the court found plain error and that the evidence was closely balanced. Herron, 215 Ill. 2d at 187-94, 830 N.E.2d at 480-84. In determining that the error required the reversal of the defendant's conviction, the court stated that the defendant in that case need not prove that the error actually

33

misled the jury.  <u>Herron</u>, 215 Ill. 2d at 193, 830 N.E.2d at 483.   Further, the court stated:

> "If the defendant carries the burden of persuasion and convinces a reviewing court
> that there was error and that the evidence was closely balanced, the case is not
> cloaked with a presumption of prejudice.  The error is actually prejudicial, not
> presumptively prejudicial. *** When there is error in a close case, we choose to
> err on the side of fairness, so as not to convict an innocent person."  <u>Herron</u>, 215
> Ill. 2d at 193, 830 N.E.2d at 483.

 See also <u>Piatkowski</u>, 225 Ill. 2d at 566, 870 N.E.2d at 411.

The plain error doctrine considers unpreserved error where the evidence is close,
regardless of the serousness of the error.  <u>Herron</u>, 215 Ill. 2d at 186-87, 830 N.E.2d at 479.
Furthermore, despite the fact that the Rule 431(b) factors were covered just not in the proper
manner,  we cannot simply ignore this error as a <u>de</u> <u>minimus</u> exception to the first prong of the
plain error rule.  See <u>People v. Lewis</u>, 234 Ill. 2d 32, 912 N.E.2d 1220 (2009) (no <u>de</u> <u>minimus</u>
exception to second prong of plain error review).  Thus, we conclude that the court's error in this
case prejudiced the defendant, as the evidence against him was closely balanced.  We therefore
reverse the defendant's conviction and remand for a new trial.

### C.  Testimony of Heather Connor

Although we have already found reversible error in this case, we will consider other
issues raised by the defendant that are likely to recur upon remand.  <u>People v. Fuller</u>, 205 Ill. 2d
308, 346, 793 N.E.2d 526, 550 (2002).  Next, the defendant contends that the trial court abused
its discretion by allowing Heather Connor to testify as to certain statements made by Erin.  The
defendant raises several objections to the propriety of the admittance of this testimony.  The

defendant argues: (1) Connor's testimony was inadmissible under Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004); (2) Erin's statements were inadmissible because they were lay opinion testimony as to the ultimate question of fact presented in the case; (3) Erin's statements were not admissible under the excited utterance exception to the hearsay rule; and (4) the prejudice of these statements was compounded by Erin's reference during cross-examination to a polygraph test. The State claims that the defendant has forfeited this issue because he did not object to the testimony at trail. On the merits of the issue, the State maintains that: (1) Connor's testimony regarding Erin's statements do not fall within Crawford because Erin's statements were not testimonial; (2) Connor's testimony was not opinion testimony and Erin's statements were not an opinion; (3) Connor's testimony as to Erin's statements were admissible as an excited utterance; and (4) Erin's reference to a polygraph test was inadvertent and made in response to a question by defense counsel.

The defendant filed a motion in limine challenging the admissibility of Connor's testimony, and included the issue in his posttrial motion. He did not, however, object to the testimony during trial. We note that the Illinois Supreme Court has stated that a motion in limine or an objection at trial in conjunction with a posttrial motion preserves an issue for appeal. People v. Hudson, 157 Ill. 2d 401, 434-35, 626 N.E.2d 161, 175 (1993). However, the court has also stated that when a motion in limine is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review. Simmons v. Garces, 198 Ill. 2d 541, 569, 763 N.E.2d 720, 738 (2002). Regardless of whether the issue has been forfeited here, we choose to consider the merits of the issue because the issue is likely to recur upon remand.

35

Connor testified that Erin asked her, "Did he hurt her?" In addition, Connor testified that Erin said, "I will never trust him with her again." Erin herself did not testify regarding these statements, nor did she give her opinion at trial as to who hit Silven. Thus, the issue is whether Connor's testimony, detailing statements made to her by Erin, was properly admitted.

The defendant first claims that his sixth amendment rights were violated when the court allowed Connor's testimony because Erin's statements were testimonial and Erin was not subject to cross-examination as to those statements. The sixth amendment's confrontation clause provides, "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amends. VI, XIV. Where testimonial evidence is at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203, 124 S. Ct. 1354, 1374 (2004). Thus, "a testimonial statement of a witness who does not testify at trial is never admissible unless (1) the witness is unavailable to testify, and (2) the defendant had a prior opportunity for cross-examination." (Emphasis in original.) People v. Stechly, 225 Ill. 2d 246, 279, 870 N.E.2d 333, 354 (2007). If the statements are not testimonial, "the confrontation clause places no restriction on their introduction (although they are still subject to 'traditional limitation upon hearsay evidence')." Stechly, 225 Ill. 2d at 279, 870 N.E.2d at 354, quoting Davis v. Washington, 547 U.S. 813, 821, 165 L. Ed. 2d 224, 237, 126 S. Ct. 2266, 2273 (2006).

Although the United States Supreme Court has declined to define "testimonial," the Illinois Supreme Court in Stechly stated that there appear to be two components to a testimonial statement. Stechly, 225 Ill. 2d at 281, 870 N.E.2d at 355. First, a testimonial statement must be

made in a solemn fashion. Stechly, 225 Ill. 2d at 281, 870 N.E.2d at 355. Second, the statement must be intended to establish a particular fact. Stechly, 225 Ill. 2d at 282, 870 N.E.2d at 355. Statements may be testimonial "even if not made directly to agents of the state." Stechly, 225 Ill. 2d at 289, 870 N.E.2d at 359. To determine whether a statement made outside of police interrogation is testimonial, the proper focus is on the declarant's intent. Stechly, 225 Ill. 2d at 289, 870 N.E.2d at 359. "Would the objective circumstances have led a reasonable person to conclude that their statement could be used against the defendant?" Stechly, 225 Ill. 2d at 289, 870 N.E.2d at 359.

In this case, Erin's statements to Connor were not testimonial. Connor was a member of the emergency medical personnel who were providing care for Silven and was not acting as an agent of the State. In addition, a reasonable person in Erin's circumstances would not have believed that her statements could be used in a criminal prosecution against the defendant. Erin made her statements to Connor after receiving information from Dr. Dabash that Silven had been hit multiple times and her brain was bleeding. Her statements were not made in response to any questioning by Connor. Erin did not identify the defendant, or anyone else, as the person who hit Silven. Rather, Erin's initial statement was a question to Connor followed by a statement that she would never trust "him" with Silven again. A reasonable person would not conclude that these ambiguous statements would be used in a criminal prosecution. Thus, Erin's statements were not testimonial.

If an out-of-court statement is nontestimonial, then traditional hearsay exceptions apply. People v. Lisle, 376 Ill. App. 3d 67, 81, 877 N.E.2d 119, 132 (2007). Here, the State maintains that Erin's statements were admissible under the excited utterance exception to the hearsay rule.

For a hearsay statement to be admissible under the excited utterance exception: "(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) there must be an absence of time for the declarant to fabricate the statement; and (3) the statement must relate to the circumstances of the occurrence." Lisle, 376 Ill. App. 3d at 77, 877 N.E.2d at 128. To determine whether the excited utterance exception applies, we consider the totality of the circumstances, "including time, the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest." Lisle, 376 Ill. App. 3d at 77, 877 N.E.2d at 128. " 'Whether a statement qualifies as an excited utterance is within the trial court's discretion.' " People v. Robinson, 379 Ill. App. 3d 679, 681, 883 N.E.2d 529, 531 (2008), quoting People v. Gwinn, 366 Ill. App. 3d 501, 517, 851 N.E.2d 902 (2006).

In this case, the totality of the circumstances do not indicate that Erin's statements were an excited utterance. Erin's statements were not based upon her own observations of the injuries inflicted upon Silven. Rather, the statements appear to be made after some reflection by Erin. Erin asked a question, "Did he hurt her?" Then, she stated, "I will never trust her with him again." Erin did not state her observations regarding Silven's injuries, but was apparently reflecting upon what may have happened to Silven or who could have hurt her. Thus, Erin's statements do not fall within the excited utterance exception to the hearsay rule. We find that the trial court abused its discretion by allowing Connor to testify as to these statements made by Erin.

### D. Testimony of Nathan Ralph

The defendant argues that the trial court erred by allowing Nathan Ralph's testimony as to statements made to him by Jeffrey Ahlers. The defendant maintains the testimony was

38

inadmissible hearsay, elicited solely to bolster Ahlers' credibility. In addition, the defendant claims that Ralph's testimony as to Ahlers' statements violated the defendant's constitutional rights under the sixth amendment's confrontation clause. The State claims that Ralph's testimony was admissible non-hearsay because Ahlers testified at trial and was subjected to cross-examination by the defendant.

The testimony at issue here consisted of the following question by the State and answer by Ralph.

"Q. Did Mr. Ahlers confide in you that he had some reservations about coming forward with some information?

A. Yes."

" 'Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule.' " People v. Caffey, 205 Ill. 2d 52, 88-89, 792 N.E.2d 1163, 118, (2001), quoting People v. Olinger, 176 Ill. 2d 326, 357, 680 N.E.2d 321 (1997). In addition, the Illinois Supreme Court has stated, " '[t]he presence or absence in court of the declarant of the out-of-court statement is * * * irrelevant to a determination as to whether the out-of-court statement is hearsay.' " People v. Lawler, 142 Ill. 2d 548, 557, 568 N.E.2d 895, 899 (1991), quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 564-65 (5th ed. 1990).

Here, Ralph testified that Ahlers confided in him that he had reservations about telling anyone about information he had concerning the defendant. The State offered this evidence to prove that Ahlers made such a statement to Ralph, as Ahlers had previously testified. Thus,

39

Ralph's testimony of Ahlers' out-of-court statement to him was offered to prove that Ahlers told Ralph he had information about the defendant but had reservations about revealing that information, and was hearsay. Based upon Lawler, we decline to find the testimony nonhearsay simply because Ahlers also testified at trial.

Further, at trial the State argued that in order to combat a possible impeachment of Ahlers that Ralph's testimony was offered to bolster Ahlers' testimony against charges of fabrication that Ahlers had reservations about coming forward with information. The State also indicated that it had no hearsay exception to offer, and it was not going to offer hearsay-on-hearsay.

Generally, "proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony." People v. House, 377 Ill. App. 3d 9, 19, 878 N.E.2d 1171, 1179 (2007). However, in an effort to rebut an express or implied charge on cross-examination that the witness is motivated or has been influenced to testify falsely or that his testimony is a recent fabrication, evidence can be admissible that the witness told the same story before the motive or influence came into existence or before the time of the alleged fabrication. People v. Cuadrado, 214 Ill. 2d 79, 90, 824 N.E.2d 214, 221 (2005); People v. Walker, 211 Ill. 2d 317, 344, 812 N.E.2d 339, 354 (2004); accord Tome v. United States, 513 U.S. 150, 156, 130 L. Ed. 2d 574, 581, 115 S. Ct. 696, 700 (1995). For the admissibility of this type of evidence, there must be an express or implied attack on these grounds on the witness during cross-examination. The mere introduction of contradictory evidence is not sufficient. Moore v. Anchor Organization for Health Maintenance, 284 Ill. App. 3d 874, 885, 672 N.E.2d 826, 834 (1996). Further, evidence of a prior consistent statement on direct examination in anticipation of a cross-examination attack is improper. People v. Crockett, 314 Ill. App. 3d 389,

40

407-08, 731 N.E.2d 823, 838 (2000). A "recent fabrication" charge can arise from negative evidence that a witness did not speak of this matter at a time when he could have. People v. Engle, 351 Ill. App. 3d 284, 289, 813 N.E.2d 761, 766 (2004). Prior consistent statements are admitted solely for rehabilitative purposes, not as substantive evidence. Walker, 211 Ill. 2d at 344, 812 N.E.2d at 354. The prior consistent statement when it is properly admissible can be testified to by either the witness himself or any other person with personal knowledge of the statement. People v. Wurster, 83 Ill. App. 3d 399, 408, 403 N.E.2d 1306, 1314 (1980).

In the instant case, it is unclear that the proper foundation was laid for the admission of a prior consistent statement to rebut the charge of recent fabrication. In fact, Ralph did not testify specifically about a specific prior consistent statement. We are only told that the witness Ahlers confided in Ralph that he had some reservations about coming forward with some information and left to speculate about what that information was. Given the record in this case, there appears to be no justification for the admission of Ralph's testimony regarding the statements allegedly made by the jailhouse informant Ahlers.

Below and on appeal, the State has not argued that Ralph's testimony was admissible under any other exception to the hearsay rule. We did not consider the applicability of any hearsay exceptions in such a circumstance. Thus, in light of the circumstances set out above, the trial court erred by allowing Ralph to testify as to the statements made to him by Ahlers in the manner presented at the trial.

### E. Trial Court's ex parte Communications With the Jury

Next, the defendant argues that the trial court violated his constitutional right to appear and participate in person at all proceedings involving his substantial rights when the trial court

41

communicated with the jury twice outside of the defendant's presence. In addition, the defendant maintains that the State cannot meet its burden to establish beyond a reasonable doubt that the defendant was not prejudiced by these ex parte communications. We have already determined that the defendant's conviction must be reversed and remanded for a new trial. Thus, we need not determine whether the defendant's rights were violated by the court's ex parte communications with the jury. However, we note that jury deliberations are a critical stage of the proceedings against a defendant, and that a defendant has a constitutional right to be present in person and by counsel during each critical stage of the trial. People v. McDonald, 168 Ill. 2d 420, 459, 660 N.E.2d 832, 849 (1995).

### F. Motion to Exclude Testimony of Jailhouse Informants

Finally, the defendant contends that the trial court erred by failing to conduct a pretrial hearing to determine the reliability of the testimony of Ahlers and Burgess and by denying the defendant's motion to exclude their testimony. The State maintains that the court did not err by declining to conduct a pretrial hearing under section 115-21 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-21 (West 2006)). In addition, the State claims that the defendant has not offered any reasons why the court abused its discretion by allowing the testimony.

Section 115-21 of the Code "applies to any capital case in which the prosecution attempts to introduce evidence of incriminating statements made by the accused to or overheard by [a jailhouse] informant." 725 ILCS 5/115-21(a), (b) (West 2006). In such cases, the trial court shall conduct a hearing to determine whether the informant's testimony is reliable. 725 ILCS 5/115-21(d) (West 2006). Here, the State did not seek the death penalty. See 720 ILCS 5/9–1(b)

(West 2006). Thus, the court was not required to conduct a hearing to determine the reliability of the informants' testimony and did not err by declining to do so. The defendant offers no other argument as to why the court abused its discretion in allowing Ahlers and Burgess to testify. Thus, we conclude that the court did not err by denying the defendant's motion.

### III. CONCLUSION

Under the plain error rule, the defendant was prejudiced by the court's failure to strictly comply with Supreme Court Rule 431(b) because the evidence against him was closely balanced and relied heavily upon the testimony of two jailhouse informants, Ahlers and Burgess. However, the evidence presented was sufficient to find the defendant guilty of first degree murder and endangering the life of a child and, thus, double jeopardy does not preclude a new trial. People v. Hernandez, 231 Ill. 2d 134, 152, 896 N.E.2d 297, 309 (2008). Further, we conclude the court erred by admitting certain testimony of Heather Connor and Nathan Ralph. Accordingly, we reverse the defendant's conviction and remand for a new trial.

Reversed and remanded for new trial.

O'BRIEN, P. J. and MCDADE, J. concurring.